IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| CORDELIA STEVENSON, | § | |
| PLAINTIFF, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 4:06-CV-819-A |
| | § | |
| MICHAEL J. ASTRUE, | § | |
| COMMISSIONER OF SOCIAL SECURITY, | § | |
| DEFENDANT. | § | |

FINDINGS, CONCLUSIONS AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE
AND
NOTICE AND ORDER

This case was referred to the United States Magistrate Judge pursuant to the provisions of

Title 28, United States Code, Section 636(b). The Findings, Conclusions and Recommendation of

the United States Magistrate Judge are as follows:

FINDINGS AND CONCLUSIONS

A.    STATEMENT OF THE CASE

Plaintiff Cordelia Stevenson filed this action pursuant to Sections 405(g) and 1383(c)(3) of

Title 42 of the United States Code for judicial review of a final decision of the Commissioner of

Social Security denying her claims for disability insurance benefits under Title II and supplemental

security income or SSI benefits under Title XVI of the Social Security Act. Stevenson applied for

SSI benefits on January 5, 2004, and for disability insurance benefits on March 8, 2004. (Tr. 61,

354). She alleges disability commencing February 7, 2002, due to heart problems, a bipolar

disorder, and a personality disorder. (Tr. 17, 74). She maintained her insured status for purposes

of disability insurance benefits through December 31, 2002.[1]    (Tr. 67).

The Social Security Administration denied Stevenson's applications for benefits both initially and on reconsideration. Stevenson then requested a hearing before an administrative law judge (the "ALJ"), and ALJ Ward D. King held a hearing on November 30, 2005 in Fort Worth, Texas. (Tr. 399). Stevenson was represented by counsel. On January 26, 2006, the ALJ issued a decision that Stevenson was not disabled and not entitled to disability insurance or SSI benefits because she retained the capacity to perform a modified range of medium work activity.[2] (Tr. 17-26). The Appeals Council denied Stevenson's request for review of her case, leaving the ALJ's decision to stand as the final decision of the Commissioner. (Tr. 4).

B.    STANDARD OF REVIEW

The Social Security Act defines a disability as a medically determinable physical or mental impairment lasting at least twelve months that prevents the claimant from engaging in substantial gainful activity. 42 U.S.C. § 423(d), 1382c(a)(3)(A); *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). To determine whether a claimant is disabled, and thus entitled to disability benefits, a five-step analysis is employed. 20 C.F.R. §§ 404.1520, 416.920. First, the claimant must not be presently working at any substantial gainful activity. Substantial gainful activity is defined as work activity involving the use of significant physical or mental abilities for pay or profit. 20 C.F.R. §§ 404.1527, 416.972. Second, the claimant must have an impairment or combination of impairments that is

---

[1] Disability must be established on or before that date to establish entitlement to disability insurance benefits. *See generally Owens v. Heckler*, 770 F.2d 1276, 1280 (5th Cir. 1985); *Oldham v. Schweiker*, 660 F.2d 1078, 1080 n.1 (5th Cir. 1981). This date does not affect her claim for SSI benefits; however, SSI benefits cannot be paid for the time preceding her application for benefits even if her disability began earlier. *See* 20 C.F.R. § 416.335.

[2] Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. 20 C.F.R. §§ 404.1567(c), 416.967(c).

severe. An impairment or combination of impairments is not severe if it has such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work. 20 C.F.R. §§ 404.1520(c), 416.920(c); *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985), *cited in Loza v. Apfel*, 219 F.3d 378, 392 (5th Cir. 2000). At the third step, disability will be found if the impairment or combination of impairments meets or equals an impairment listed in the appendix to the regulations. *Id.* §§ 404.1520(d), 416.920(d). Fourth, if disability cannot be found on the basis of the claimant's medical status alone, the impairment or impairments must prevent the claimant from returning to his past relevant work. *Id.* §§ 404.1520(e), 416.920(e). And fifth, the impairment must prevent the claimant from doing any work, considering the claimant's residual functional capacity, age, education, and past work experience. *Id.* §§ 404.1520(f), 416.920(f); *Crowley v. Apfel,* 197 F.3d 194, 197-98 (5th Cir.1999).

At steps one through four, the burden of proof rests upon the claimant to show he is disabled. If the claimant satisfies this responsibility, the burden shifts to the Commissioner at step five of the process to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairments. *Crowley*, 197 F.3d at 198. If the Commissioner meets this burden, the claimant must then prove that he cannot in fact perform the work suggested. *Waters v. Barnhart*, 276 F.3d 716, 718 (5th Cir. 2002). A finding at any point in the five-step process that a claimant is disabled or not disabled is conclusive and terminates the analysis. *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002).

A denial of disability benefits is reviewed only to determine whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in

the record as a whole. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *Hollis v. Bowen*, 837 F.2d 1378, 1382 (5th Cir. 1988). Substantial evidence is such relevant evidence as a responsible mind might accept to support a conclusion. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). It is more than a mere scintilla, but less than a preponderance. *Id.* A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Id.* This Court may neither reweigh the evidence in the record nor substitute its judgment for the Commissioner's, but will carefully scrutinize the record to determine if the evidence is present. *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir.2000); *Hollis*, 837 F.2d at 1383.

C.     ISSUES

    1.     Whether the ALJ properly evaluated Stevenson's mental impairment;

    2.     Whether the residual functional capacity assessment is supported by substantial evidence; and

    3.     Whether the finding that Stevenson can perform other work available in significant numbers is supported by substantial evidence.

D.     ADMINISTRATIVE RECORD

    1.     Treatment History

The administrative record provides the following information about Stevenson's impairments: Stevenson attempted suicide at least ten times between the ages of eight and thirty-six, (Tr. 227); however, the earliest treatment records provided are from October 2003 when she sought mental health services from Tarrant County Mental Health and Mental Retardation (MHMR).  (Tr. 352).

    Beginning in December 2003, Stevenson saw psychiatrist Geetha Reddy, M.D., and the staff

at MHMR every two to four weeks. The MHMR progress notes indicate that Stevenson exhibited a depressed, dysphoric, irritable, or anxious mood during her visits. (Tr. 192-273). Stevenson reported occasional auditory or visual hallucinations and admitted to a history of drug and alcohol abuse, but denied using drugs since beginning treatment at MHMR. A staff member at MHMR assessed Stevenson as having a moderately severe level of hostility, and an extremely impaired response to stress and anxiety. (Tr. 223-24). She had a lot of anger directed at her husband, and on more than one occasion, expressed a desire to hurt him. (Tr. 194, 205, 218, ). Stevenson's Global Assessment of Functioning (GAF) score generally stayed around 45 during the course of her treatment at MHMR.[3]

Reddy and Stevenson's MHMR case manager issued a joint statement in September 2004 that Stevenson was not capable of maintaining gainful employment, and that the duration of her disability was indeterminate. (Tr. 191). In November 2004, Reddy completed a mental assessment questionnaire and found that Stevenson was still depressed and experiencing mood swings (mostly irritability) and hallucinations. (Tr. 275). Stevenson was taking Seroquel, Depakot, and Wellbutrin, and had reported no side-effects at her most recent appointment. Her prognosis was guarded, and Reddy opined that even a minimal increase in mental demands or change of environment would cause Stevenson to decompensate. (Tr. 275-76).

Reddy further opined that Stevenson had no or mild restriction in her activities of daily

---

[3] A GAF score is a standard measurement of an individual's overall functioning level with respect to psychological, social, and occupational functioning. AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed. 1994)(DSM-IV). A GAF score of 41 to 50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job). DSM-IV at 34

living, extreme difficulty maintaining social functioning, and moderate concentration difficulties. Reddy also found that Stevenson had experienced one or two episodes of decompensation within a twelve-month period. (Tr. 277). Reddy asserted that Stevenson had no useful ability to complete a normal workday or workweek without interruption from psychologically based symptoms or to accept instructions and respond appropriately to criticism from supervisors. (Tr. 278). Reddy also found that Stevenson would not meet competitive standards with respect to her ability to maintain attention for two-hour segments; maintain regular attendance and punctuality; sustain an ordinary routine without special supervision; work in proximity to others without being unduly distracted; perform at a consistent pace without an unreasonable number or length of rest periods; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; respond appropriately to changes in the work place; deal with normal work stress; be aware of normal hazards and take the appropriate precautions; travel in unfamiliar places; or use public transportation. (Tr. 269-70). Reddy declined to complete questions that inquired about Stevenson's ability or aptitude for semi-skilled or skilled work because Stevenson had remained unemployed throughout her treatment at MHMR. (Tr. 270). Reddy completed a second questionnaire in November 2005 that included findings similar to those in the 2004 questionnaire. (Tr. 346-51).

In addition to MHMR services, Stevenson has been seen by physicians at the county health clinic for exacerbations of bipolar disorder. (Tr. 135-38). In December 2003, she reported doing much better on medications and stated that she had not used alcohol or cocaine since October. (Tr. 135-36). The staff physician assessed a GAF score of 55.[4] Stevenson was instructed to increase her

---

[4]. A GAF score of 51 to 60 reflects moderate symptoms or moderate impairment in functioning. DSM-IV at 34.

morning dose of medications, and another antidepressant, Lexapro, was added to her treatment regimen. (Tr. 138). During a follow-up visit in January 2004, Stevenson stated that she was doing well on her medications with no side-effects other than decreased libido. (Tr. 133). She denied having any current problems. She was assigned a current GAF score of 70.[5] (Tr. 134).

In September 2004, Stevenson suffered a two-day blackout: The police took her to the county emergency room, where she told the medical staff that she remembered leaving her home two days earlier, but could recall nothing else until she arrived at the hospital. (Tr. 298-303). She admitted using cocaine six months earlier and marijuana one year earlier, (Tr. 300), and the staff opined that a substance-induced psychosis needed to be ruled out. (Tr. 298-303). Stevenson was assigned a current GAF score of 50. (Tr. 305).

In addition to her mental impairments, Stevenson has complained of heart palpitations that cause shortness of breath, sweating, tingling in her hands, and dizziness. (Tr. 127, 131, 145). Diagnostic studies showed an ejection fraction of 65%,[6] with rare premature ventricular contractions. (Tr. 131). Her cardiologist placed her on medication and advised her that her arrhythmia was not dangerous. (Tr. 131). Stevenson also sought treatment for an episode of chest pain in July 2004, but that pain was thought to be a result of anxiety. (Tr. 286).

State agency medical consultants who reviewed Stevenson's medical records initially and on reconsideration found her to be mildly restricted in her activities of daily living, with moderate

---

[5] A GAF score of 61-70 reflects mild symptoms. *Id.*

[6] Ejection fraction is the proportion of the volume of blood in the ventricles at the end of diastole that is ejected during systole, and is often expressed as a percentage. It is normally sixty-five percent (plus or minus eight percent), and lower values indicate ventricular dysfunction. Dorland's Illustrated Medical Dictionary 708 (29th ed. 2000). Diastole is the dilation of the heart, while systole refers to contraction of the heart. *Id.* at 494, 1781.

impairment in her social functioning and moderate impairment in her concentration, persistence, and pace. (Tr. 160). The state agency medical consultants who assessed Stevenson's physical limitations opined that she could lift twenty-five to fifty pounds, with no other restrictions noted. (Tr. 184-89).

2.      Administrative Hearing

Stevenson testified that she was born July 23, 1966. She had a GED, and she had most recently worked as a plumber's helper. (Tr. 403). She was terminated because she missed too many days of work. (Tr. 404). Stevenson testified that she had had many jobs, but was fired from all of them because of tardiness, absences, and difficulty getting along with her boss or other employees. (Tr. 404-05).

Stevenson testified that she took medication for a heart condition, and she had been told that her palpitations were caused by a hole in a heart valve. (Tr. 414-15). She also had hip pain and low back pain due to snapping hip syndrome, which made it difficult for her to rise from a seated position. (Tr. 405-06). Stevenson complained of chronic bronchitis, and testified that she smoked one-half to three-quarters of a pack of cigarettes each day. (Tr. 406).

Stevenson testified that she had a lengthy history of emotional problems stemming from an abusive childhood. (Tr. 406). She also described symptoms of an obsessive-compulsive disorder, and testified that she experienced auditory hallucinations. (Tr. 407-08). Her bipolar disorder caused her to have manic days and depressive days. On manic days, she felt high-strung and would yell at her family. (Tr. 408). When depressed, she found it difficult to get out of bed or get dressed. (Tr. 408). Stevenson testified that she had been married six times, and had been married to her current

husband for two years. (Tr. 411). She had served three years in prison for attempted murder for stabbing one of her former husbands during a fight. (Tr. 412-13).

Stevenson saw her psychiatrist at MHMR on a routine basis, but continued to have problems with anger and hostility. (Tr. 410). She testified that her medications sometimes made her drowsy. (Tr. 409). Stress seemed to trigger her mania and violent tendencies, (Tr. 410), and she admitted making numerous suicide attempts. Stevenson testified that she had completed a drug rehabilitation program and no longer abused drugs. She had attended support meetings for a while, but no longer attended the meetings because she was considered to be in remission. (Tr. 411).

Stevenson complained of panic attacks when she was stressed. The attacks caused tightness in her chest and palpitations that made her break into a cold sweat. (Tr. 417). Stevenson also testified that she suffered from a disassociative disorder and had once disappeared for two days with no memory of where she had been. She continued to experience small amounts of time when she could not recall what happened.

Vocational expert Barbara Dunlap testified during the hearing. The ALJ asked Dunlap to consider the following hypothetical:

> Take an individual who is a younger individual with a GED diploma and the same work history as Ms. Stevenson. The hypothetical individual can perform a full range of medium work, however, the individual is limited to jobs with a reasoning develop[ment] level of one to three as defined in the Dictionary of Occupational Titles. In addition, the individual is limited to no more than incident[al] contact with the public and co-workers.

(Tr. 418). After Stevenson clarified her previous job responsibilities, the ALJ also instructed Dunlap to assume that the hypothetical individual could perform none of Stevenson's past relevant work. (Tr. 419). Dunlap testified that there was other work meeting the restrictions of the hypothetical.

Examples of suitable work included laundry laborer (with 8,000 jobs in Texas and 80,000 jobs nationwide), stock clerk (with more than 8,000 jobs in Texas and 100,000 jobs nationwide), and packager positions (with 6,000-8,000 jobs in Texas and 80,000 jobs nationwide). (Tr. 419-20). All of the jobs were considered entry-level, unskilled positions. Stevenson's counsel then asked Dunlap to consider the work-related limitations outlined in Reddy's report. Dunlap responded that a claimant with those limitations would be unable to perform any work. (Tr. 420-21).

### 3. ALJ Decision

The ALJ found that Stevenson had not engaged in substantial gainful activity since her alleged onset date. He also found that Stevenson's heart palpitations and bipolar disorder constituted a severe combination of impairments; however, he found that Stevenson had no impairment or combination of impairments meeting or equaling the criteria for a listed impairment. (Tr. 18). The ALJ instead found that Stevenson retained the residual functional capacity for the full range of medium work, except she required jobs with a reasoning level of one, two, or three as defined in the Dictionary of Occupational Titles (DOT) and was limited to no more than incidental contact with the public and coworkers. (Tr. 24). Based on the vocational expert's testimony, the ALJ found that there were a significant number of jobs in existence in the national economy that Stevenson could perform. (Tr. 25). Accordingly, the ALJ concluded that Stevenson was not eligible for disability insurance or SSI benefits. (Tr. 25-26).

D.    DISCUSSION

1.    Treating Source Opinions

Stevenson contends that the ALJ did not properly evaluate her mental impairment and failed to give appropriate weight to the opinions of her treating psychiatrist. The ALJ found that Stevenson's mental impairment limited her to work requiring only incidental contact with the public or coworkers and tasks at the lowest levels of reasoning, but Stevenson asserts that she has numerous other work-related limitations as reflected in Reddy's medical source statement.

The opinions, diagnoses, and medical evidence of a treating physician who is familiar with the claimant's impairments, treatments, and responses should be given great weight in determining disability. *See Leggett v. Chater*, 67 F.3d 558, 566 (5th Cir. 1995); *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994). The ALJ assigns controlling weight to the opinion of a treating physician if well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527; *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995).

Even if a treating source opinion is not entitled to controlling weight under the regulations, that does not mean the opinion should be completely rejected. In many cases, the opinion may be entitled to the greatest weight and should be adopted even if it does not satisfy the test for controlling weight. SOCIAL SECURITY RULING 96-2p. However, the determination of disability always remains the province of the ALJ, and the ALJ can decrease the weight assigned to a treating physician's opinion for good cause, which includes disregarding statements that are brief and conclusory, unsupported by acceptable diagnostic techniques, or otherwise unsupported by the

evidence. *See* 20 C.F.R.. § 404.1527(e); *Leggett*, 67 F.3d at 564; *Greenspan*, 38 F.3d at 237.

The ALJ afforded little weight to Reddy's statements because he found the objective evidence did not support a finding of disability based on Stevenson's mental impairments. (Tr. 23). Stevenson, however, urges that the ALJ reached this decision without performing the analysis required by the administrative regulations and Fifth Circuit precedent. Before rejecting a treating source opinion, the ALJ must address several relevant factors, including the length of the treatment relationship, frequency of examination, nature and extent of the treating relationship, evidence supporting the opinions, the consistency of those opinions, and medical specialization. *See* 20 C.F.R. §§ 404.1527(d), 416.927(d); *Newton v. Apfel*, 209 F.3d 448, 456 (5th Cir. 2000). *See also* SOCIAL SECURITY RULING 96-2p, 96-5p.

Stevenson asserts that a review of the relevant factors establishes that Reddy's opinions were entitled to the greatest weight because Reddy is a specialist, Reddy has seen Stevenson every two to four weeks since 2003, and Reddy provided a detailed explanation and cited findings to support her opinions. Stevenson further asserts that the ALJ erred in finding that the treatment records contradicted Reddy's opinions, and she observes that her GAF scores in her MHMR progress reports consistently reflect moderate to serious impairment in her functioning.

The ALJ acknowledged Reddy's position as a treating psychiatrist who had a long treatment relationship with Stevenson; however, the ALJ found that the MHMR progress reports did not document such significant deficits as to warrant a conclusion of disability or support the limitations that Reddy assessed. (Tr. 23). The ALJ specifically found that Stevenson's GAF scores, as assessed at MHMR, were inconsistent with her overall functioning, symptom severity, and mental status

examinations documented in the record. The ALJ noted that treating sources at the county health clinic had assessed GAF scores that were more consistent with Stevenson's reports of improvement. (Tr. 23).

Stevenson accuses the ALJ of substituting his own lay opinions for those of a treating medical source and "picking and choosing" among the evidence. It is the ALJ's responsibility to weigh all medical opinions with the rest of the relevant evidence received. 20 C.F.R. §§ 404.1527(b), 416.927(b). The ALJ cannot pick and choose among the evidence, but need not mention each and every piece of evidence in the file so long as he has developed the record fully and fairly and has sufficiently articulated the basis for his decision. *See Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996); *Miller v. Shalala*, 8 F.3d 611, 613 (8th Cir. 1993). A review of the ALJ's written decision demonstrates that the ALJ complied with the regulations in considering the weight to be afforded to Reddy's opinions, and his decision to afford little weight to those opinions is supported by substantial evidence.

Stevenson also complains that the ALJ should have recontacted Reddy before rejecting her opinions. The ALJ has a duty to develop the facts fully and fairly, and if he does not satisfy this duty, his decision is not substantially justified. *Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir.2000); *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir.1995). If necessary, the ALJ should recontact a treating physician to resolve any doubts or gaps in the record. *Newton*, 209 F.3d at 457-58. *See also* 20 C.F.R. §§ 404.1512(e), 416.912(e); Social Security Ruling 96-5p. But the failure to request additional information from treating or examining sources is reversible error only if prejudicial. The claimant must establish prejudice by showing that, if the ALJ had developed the record, additional

evidence would have been produced that might have led to a different decision. *Newton*, 209 F.3d at 458.

The ALJ did not find that the record was inadequate or that there were unresolved areas needing further development before a decision could be rendered. Moreover, Stevenson does not demonstrate that recontacting Reddy would have produced additional evidence material to the issue of her disability. Without a showing of prejudice, there is no basis for disturbing the ALJ's assessment of Reddy's medical source statements.

2. Listing-Level Impairment

Stevenson asserts that her mental impairments meet or equal the severity of a listed impairment. She also complains that the ALJ should have obtained the services of a medical expert to address this issue.

The burden of establishing an impairment of listing-level severity is on the claimant. *Waters v. Barnhart*, 276 F.3d 716, 718 (5th Cir. 2002). In addition, the decision to consult a medical expert or advisor is a discretionary one. *See Haywood v. Sullivan*, 888 F.2d 1463, 1467-68 (5th Cir.1989). The ALJ may ask for and consider opinions from medical experts on the nature and severity of an impairment, or its equivalence to any listed impairment, if the ALJ feels it is necessary. *Id.* at 1467. *See generally* 20 C.F.R. §§ 404.1527(f)(2)(iii), 416.927(f)(2)(iii). But the final responsibility for deciding whether an impairment meets or equals a listed impairment is reserved to the Commissioner. *See* 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2). *See also* 20 C.F.R. §§ 404.1526(e), 416.926(e).

Stevenson asserts that her mental impairment satisfies Listing 12.04, which addresses

affective disorders:

12.04 Affective Disorders: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome.
. . . .
A. Medically documented persistence, either continuous or intermittent, of one of the following:

1. Depressive syndrome characterized by at least four of the following:
      a. Anhedonia or pervasive loss of interest in almost all activities; or
      b. Appetite disturbance with change in weight; or
      c. Sleep disturbance; or
      d. Psychomotor agitation or retardation; or
      e. Decreased energy; or
      f. Feelings of guilt or worthlessness; or
      g. Difficulty concentrating or thinking; or
      h. Thoughts of suicide; or
      i. Hallucinations, delusions or paranoid thinking; or
2. Manic syndrome characterized by at least three of the following:
      a. Hyperactivity; or
      b. Pressure of speech; or
      c. Flight of ideas; or
      d. Inflated self-esteem; or
      e. Decreased need for sleep; or
      f. Easy distractibility; or
      g. Involvement in activities that have a high probability of painful consequences which are not recognized; or
      h. Hallucinations, delusions or paranoid thinking;
or
3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);
      AND
B. Resulting in at least two of the following:
      1. Marked restriction of activities of daily living; or
      2. Marked difficulties in maintaining social functioning; or
      3. Marked difficulties in maintaining concentration, persistence, or pace; or
      4. Repeated episodes of decompensation, each of extended duration;
OR
C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or

psychosocial support, and one of the following:
>1. Repeated episodes of decompensation, each of extended duration; or
>2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
>3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Part 404, Subpart P, app. 1, § 12.04. Stevenson asserts that her impairment satisfies the A and C criteria;[7] however, most of the examples that Stevenson cites in support of her position, including previous suicide attempts and the assault on her ex-husband, occurred before she filed for benefits and before any documented treatment for her substance abuse problems and bipolar disorder. As for her two-day blackout, the ALJ noted that the episode caused the examining physician to question if Stevenson had experienced a substance-induced psychosis. (Tr. 20). The ALJ concurred with the opinions of the state agency medical consultants, who found that Stevenson's impairments did not meet or equal any listed impairment. (Tr. 19).

Stevenson asserts that the opinions from the state agency medical consultants were outdated and unreliable because they were issued without the opportunity to review Reddy's opinions, which were submitted later. Social Security Ruling 96-6p does require the ALJ to obtain an updated opinion from a medical expert when additional medical evidence has been received that in the opinion of the ALJ may change the state agency consultant's decision that an impairment is not equivalent in severity to any listed impairment. SOCIAL SECURITY RULING 96-6p. The ALJ,

---

[7] Meeting only the A criteria is insufficient. The required level of severity is met when the C criteria is met, or alternatively, when both the A and B criteria are satisfied. 20 C.F.R. Part 404, Subpart P, app. 1, § 12.04.

however, explained why he afforded little weight to Reddy's opinions, and he did not find that any

additional information had been received that might change the opinions of the state agency medical

consultants. No new medical expert opinion was necessary.

Stevenson also argues that the record suggests that she may be of below-average intelligence

and qualify for disability under Listing 12.05C, but the ALJ did not fully develop the record on this

issue. Listing 12.05 provides the following criteria for disability as a result of mental retardation:

> 12.05 Mental retardation: Mental retardation refers to significantly subaverage
> general intellectual functioning with deficits in adaptive functioning initially
> manifested during the developmental period; i.e., the evidence demonstrates or
> supports onset of the impairment before age 22.
> . . . .
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or
> other mental impairment imposing an additional and significant work-related
> limitation of function;

20 C.F.R. Part 404, Subpart P, app. 1, § 12.05C. Stevenson asserts that it is possible that she has

a low IQ that, in conjunction with her palpitations and bipolar disorder, would meet the listing.

Stevenson did not apply for disability based on mental retardation. She dropped out of high school,

but later obtained her GED, and there are no diagnostic test results documenting Stevenson's

intellectual abilities or deficits in adaptive functioning before age 22. Stevenson also has a lengthy

work history and testified that she was fired from her jobs because of frequent absences, tardiness,

or personality conflicts, not because of a lack of mental capacity to perform the work. There is one

notation in the MHMR records that Stevenson demonstrated "slightly low intellectual functioning,"

(Tr. 224), but the court finds that this one notation in two years of treatment records did not put the

ALJ on notice that Stevenson might be disabled as a result of mental retardation.

Stevenson has not shown a lack of substantial evidence to support the ALJ's determination

that she fails to meet or medically equal the criteria of a listed impairment, nor has she shown that the ALJ erred in failing to consult a medical expert.

       3.      RFC Assessment

Stevenson contends that the RFC assessment is not supported by substantial evidence. She complains that the ALJ made no allowance for her heart palpitations in either her physical or mental work-related limitations. She also complains that the ALJ failed to include numerous mental limitations reflected in the treatment records and in Reddy's opinion, nor did he consider the side-effects of her medications.

RFC is what an individual can still do despite his limitations. SOCIAL SECURITY RULING 96-8p. It reflects the individual's maximum remaining ability to do sustained work activity in an ordinary work setting on a regular and continuing basis. *Id.*; *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001). A regular and continuing basis is an eight-hour day, five days a week, or an equivalent schedule. SOCIAL SECURITY RULING 96-8p. RFC is not the least an individual can do, but the most. *Id.* The RFC assessment is a function-by-function assessment, with both exertional and nonexertional factors to be considered. *Id.* The ALJ will discuss the claimant's ability to perform sustained work activity on a regular and continuing basis, and will resolve any inconsistencies in the evidence. *Id.* The ALJ is permitted to draw reasonable inferences from the evidence in making his decision, but the social security rulings also caution that presumptions, speculation, and supposition do not constitute evidence. SOCIAL SECURITY RULING 86-8.

With respect to Stevenson's palpitations, the ALJ expressly stated that he was giving her the benefit of the doubt by restricting her to medium work. (Tr. 23). The ALJ also found that Stevenson

should have limited contact with the public and coworkers because of her anger and irritability. The ALJ summarized Stevenson's testimony that her medications made her drowsy, but did not expressly address the side-effects of Stevenson's medications;[8] however, he stated that he was giving her the benefit of the doubt in finding that she had some concentration deficits and limiting her to work at the lower levels of reasoning. Stevenson has not demonstrated that the ALJ's failure to address this issue more explicitly warrants reversal or remand of the Commissioner's decision. As for the additional limitations that Reddy found, the ALJ explained his reasons for giving little weight to Reddy's assessment in light of Stevenson's progress and improvement with treatment.

Stevenson, however, contends that her treatment records reflect that her condition waxes and wanes, preventing her from maintaining employment even if she is capable of obtaining a job initially. She complains that the ALJ assessed her RFC without making a specific finding as to her ability to maintain employment.

The Fifth Circuit has decided that, in assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis. *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001). A finding that a claimant can perform substantial gainful activity requires more than a determination that the claimant can find work and physically perform the job: There must also be a determination that the claimant could hold whatever job he obtains for a significant period of time. *Watson v. Barnhart*, 288 F.3d 212, 217 (5th Cir. 2002). *See also Singletary v. Bowen*, 798 F.2d 818 (5th Cir. 1986).

Contrary to Stevenson's argument, the ALJ specifically found that Stevenson could obtain,

_____

[8] MHMR notes reflect few complaints of side-effects.

perform, and maintain medium work activity requiring a reasoning development level of one, two, or three and no more than incidental contact with the public and coworkers. (Tr. 24). The ALJ also cited Fifth Circuit authority in making this finding. Additionally, there is no indication that the ALJ failed to appreciate that the ability to maintain employment is a consideration inherent in any RFC assessment. *See Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir. 2003).

Stevenson has not shown that the ALJ's assessment of her RFC is either unsupported by substantial evidence or a result of legal error.

4.      Vocational Evidence

Stevenson contends that the ALJ erred in finding that there is other work existing in significant numbers that she can perform. She also contends that this finding is unsupported by substantial evidence because of conflicts between the vocational expert's testimony and the DOT.

Stevenson complains that the hypothetical presented to the vocational expert was defective because it failed to reflect all of her work-related mental limitations. Her argument is a restatement of her contention that the ALJ erred in his assessment of her RFC, thus causing the ALJ to present the vocational expert with a flawed hypothetical question. *See generally Boyd v. Apfel*, 239 F.3d 698, 707 (5th Cir. 2001); *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994). But as already determined, Stevenson has not established error in the assessment of her RFC or a lack of substantial evidence supporting that assessment.

Stevenson contends that the Commissioner did not meet his burden because at least one of the jobs identified by the vocational expert is not compatible with her RFC. The vocational expert identified three jobs as suitable for a person with Stevenson's RFC: Laundry laborer, stock clerk,

and packager positions. Stevenson correctly notes that the DOT classifies the job of stock clerk as heavy work, which exceeds her exertional capacity. *See* DICTIONARY OF OCCUPATIONAL TITLES § 222.387-058 (rev. 4th ed. 1991). *See generally Carey v. Apfel*, 230 F.3d 131, 146-47 (5th Cir.2000)(discussing appropriate treatment of conflicts between the DOT and vocational expert testimony).

Eliminating the job of stock clerk, however, leaves two suitable occupations that Stevenson does not challenge: Laundry laborer, with 8,000 jobs in Texas and 80,000 jobs nationwide, and packager positions, with 6,000-8,000 jobs in Texas and 80,000 jobs nationwide. The ALJ's determination that Stevenson is capable of performing other work existing in significant numbers in the national and local economies is supported by substantial evidence.[9]

<u>RECOMMENDATION</u>

It is recommended that the Commissioner's decision be affirmed.

<u>NOTICE OF RIGHT TO OBJECT TO PROPOSED
FINDINGS, CONCLUSIONS AND RECOMMENDATION
AND CONSEQUENCES OF FAILURE TO OBJECT</u>

Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file specific written objections in the United States District Court to the United States Magistrate Judge's proposed findings, conclusions and recommendation within ten (10) days after the party has been served with a copy of this document. The court is hereby extending the deadline within which to file

---

[9] Stevenson argues that the elimination of even one job causes there to be insufficient evidence to support the ALJ's decision at step five. Stevenson relies on *Bagwell v. Barnhart*, 338 F.Supp.2d 723 (S.D. Tex. 2004), but that reliance is misplaced. In *Bagwell*, the VE grouped all of the jobs together in arriving at the number of jobs available nationally and locally, instead of identifying the number of jobs available for each job individually. Thus, elimination of one job resulted in uncertainty about the number of jobs remaining that Bagwell could perform. *Id.* at 738.

specific written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation until September 17, 2007. The United States District Judge need only make a *de novo* determination of those portions of the United States Magistrate Judge's proposed findings, conclusions and recommendation to which specific objection is timely made. *See* 28 U.S.C. § 636(b)(1). Failure to file by the date stated above a specific written objection to a proposed factual finding or legal conclusion will bar a party, except upon grounds of plain error or manifest injustice, from attacking on appeal any such proposed factual findings and legal conclusions accepted by the United States District Judge. *See Douglass v. United Services Auto Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996)(en banc).

## ORDER

Under 28 U.S.C. § 636, it is hereby ORDERED that each party is granted until September 17, 2007 to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation. It is further ORDERED that if objections are filed and the opposing party chooses to file a response, the response shall be filed within seven (7) days of the filing date of the objections.

It is further ORDERED that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions and recommendation, be and hereby is returned to the docket of the United States District Judge.

SIGNED AUGUST 27, 2007.

   /s/   Charles Bleil                
CHARLES BLEIL
UNITED STATES MAGISTRATE JUDGE